# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| In re:          ) | |
|          ) | Case No. 19-72449-FJS |
| DAWN ELAINE REED,    ) | |
|          ) | Chapter 13 |
| *Debtor.*    ) | |
|          ) | |

## MEMORANDUM OPINION

Dawn Elaine Reed ("Dawn") filed a voluntary petition under chapter 13 of the Bankruptcy Code on June 27, 2019. Planet Plumbing, LLC ("Planet") filed an unsecured claim on July 19, 2019 (the "Original Claim"), which it amended on August 9, 2019 (the "Amended Claim"). On September 6, 2019, Dawn objected to the allowance of the Original Claim and the Amended Claim pursuant to 11 U.S.C. § 502(b)(1) and Federal Rule of Bankruptcy Procedure 3007 (the "Objection"), initiating a contested matter under Federal Rule of Bankruptcy Procedure 9014. Accordingly, this matter is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(B) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

The Court convened a preliminary hearing on the Objection on October 22, 2019. Following the preliminary hearing, the Court established pre-trial deadlines and set the matter for trial to be convened on March 11, 2020. Pre-Trial Order, ECF No. 26. At trial, the Court received evidence in the form of witness testimony and exhibits.[1] Upon the conclusion of trial, the Court ordered the parties to submit post-trial briefs and reserved the right to schedule oral arguments if

---

[1]     The Court accepted into evidence, without objection, Debtor's Exhibits 1, 2, 3, 4, and 5. The Court further accepted into evidence, without objection, Claimant's Exhibits A, B, H, BK, BL, BM, BN, BO, BP, BQ, BR, BS, BT, and BU. Upon the establishment of a proper foundation, the Court also admitted Claimant's Exhibit M and a portion of Claimant's Exhibit L.

the Court deemed necessary upon its review of the briefs.  Following review of the parties' post-trial briefs, the Court took the matter under advisement.

Upon consideration of the evidence presented at trial and for the reasons set forth below, the Court finds and concludes that the Amended Claim shall be allowed in the amount of $74,429.23, with no prejudgment interest awarded.  This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

## I. Findings of Fact

### a. The Renovations

In the fall of 2013, Dawn owned two pieces of real property:  a home located at 241 Bridge Landing Court, Virginia Beach, Virginia ("Bridge Landing") and a home located at 2633 East Lake Drive, Virginia Beach, Virginia ("East Lake").  Tr. of Mar. 11, 2020 Trial ("Tr.") 41:12-42:9, ECF No. 51.  Knowing her employment contract would expire at the end of 2013, Dawn anticipated that she would soon be unable to afford the mortgages on both properties.  *Id.* 45:11-12.  Dawn thus sought to sell East Lake while she continued to reside at Bridge Landing with her mother and her daughter.  *See id.* 41:19-42:18.  Her efforts to sell East Lake proved successful when she received an offer in late October of 2013.  Claimant's Ex. BK.  But the receipt of the offer led Dawn to reevaluate whether to sell East Lake—a home that had been in her family for twenty-five years, Tr. 42:8-9—or renovate East Lake and reside there.  *See* Claimant's Ex. BK.

With the pressure of having an offer to purchase East Lake on the table, Dawn discussed the possibility of renovating East Lake with Jack Reed ("Jack"), her brother and the president of Planet.  *See id.*  At trial, Dawn testified that Jack approached her with a "plan to fix the family home up" with all labor to be performed by him at no cost to Dawn.  Tr. 42:13-43:8.  However,

the text messages between the two following Dawn's receipt of the offer to purchase East Lake do not suggest that Jack made such a proposal.  Rather, in a primarily one-sided string of text messages, Dawn pitched to Jack the many personal and financial advantages of renovating East Lake so that she could relocate there.  *See* Claimant's Ex. BK.  Dawn assured Jack repayment of "every last penny" if he could "make the house liveable and make sure it is mold free" and pleaded that she would "do anything" if he agreed to undertake the renovation project.  *Id.*  Dawn added that the renovations would have to be done quickly so she could put Bridge Landing on the market as soon as possible.  *Id.*  Over the course of a few days, Dawn pressed Jack for an answer, but received no response.  *See id.*

An email exchange in early November 2013 between Dawn and Kim Reed ("Kim"), Jack's wife and Planet's bookkeeper, imply that further discussions between Dawn and Jack had ensued, resulting in Dawn's decision to renovate East Lake in lieu of going through with the sale.  *See* Claimant's Ex. BL.  In her emails to Dawn, Kim emphasized multiple times that the East Lake renovations must be performed by Planet "as a job" with repayment upon completion.  *Id.*  Kim also expressed her concern that the necessary renovations would require "a lot of man hours" and cost far in excess of the limited funds—up to $15,000—that Planet had on hand, and that Dawn would be unhappy with how little time Jack could invest in the project.[2]  *Id.*  Kim urged Dawn to reconsider.  *Id.*  In response, Dawn assured Kim that her objective was only to make East Lake

---

[2]      Dawn argues that any contract formed was between her and Jack, rather than between her and Planet, and that Planet therefore is not the proper claimant.  Debtor's Post-Trial Br. ¶ 55, ECF No. 50; Debtor's Response Br. ¶ 8, ECF No. 54.   However, Dawn's contemporaneous communications with Kim suggest she knew that was not the case.  Claimant's Ex. BL (following Kim's reminder that "[t]he money has to come from the business" and that the "money has to be paid back as a job, [as] it is a business venture and not Jack trying to save the family home," Dawn responded that she "do[es] not view this as a free handout, but as [a] job").  As such, the Court finds that the evidence clearly indicates her understanding that Planet would be undertaking the renovation work, and accordingly concludes that Dawn's allegations are without merit.

3

"liveable" and that the renovations would not be prolonged. *Id.* ("[Jack] agreed that this would be a fast process as my [employment] contract ends Dec 31, so neither of us wants to drag it out."). Dawn acknowledged that she would benefit because Planet would begin work without upfront payment, but confirmed her understanding that Planet was undertaking the project "as [a] job" and reiterated her commitment to "pay back every cent." *Id.*

With Dawn's employment contract set to expire at the end of 2013, it was essential to renovate East Lake as soon as possible so that she could move in and sell Bridge Landing. *See* Tr. 79:14-21; Claimant's Ex. BL; Debtor's Ex. 5. Dawn also needed to sell Bridge Landing because she believed she possessed equity in Bridge Landing of "about $40- to $50,000" that would enable her to repay Planet for the renovations to East Lake from the proceeds of the Bridge Landing sale. Tr. 44:17-22, 61:13-17. Dawn testified that, before renovations commenced, Jack had assured her that the work would be done in time for her to move into East Lake by the end of 2013. *Id.* 79:11-21; *see also* Claimant's Ex. BL; Debtor's Ex. 5. Though Jack denies that he assured this outcome, he agrees that he and Dawn discussed having East Lake move-in ready by the year's end. Tr. 69:7-11. Indeed, an anticipated quick turnaround on the project is consistent with Jack's testimony as to his initial understanding of the scope of the renovations, which included primarily cosmetic items such as paint, sheetrock repair, and new carpeting. *Id.* 62:16-22.

The parties agree that the East Lake renovations did not commence in 2013 as originally intended. *Id.* 67:19-23; 80:6-8. When work did begin in 2014, the scope of the project expanded to address the effects of a latent water leak, and ultimately included painting, countertop replacement, hardwood floor refinishing, interior and exterior demolition, framing, door installation, elevated deck construction, siding installation, sheetrock installation, plastering, drywall repair, baseboard and molding installation, scraping of textured ceilings, bathroom

4

remodeling, and carpet replacement.  *See id.* 46:15-19, 47:3-16, 62:23-63:3, 73:5-16, 75:18-19;

Claimant's Exs. A, H, L, M.  After the project was underway, Dawn checked on the progress

periodically at Jack's direction.  Tr. 54:9-17.

To complete the East Lake renovations, Planet enlisted the assistance of subcontractors.

*See id.* 54:9-17, 63:5-19; Claimant's Ex. A.  The parties disagree on whether this was

contemplated.  Jack claimed that Dawn understood that the project would require the use of

subcontractors and that hiring subcontractors is customary and necessary when a job requires

skilled trades outside Planet's expertise.  Tr. 63:5-11, 71:7-16.  Whereas Dawn testified that she

believed that only Jack himself would perform the labor and would do so gratuitously.  *Id.* 55:6-8.

Nevertheless, it is uncontroverted that, after the renovations commenced, Dawn was aware of

Planet's use of subcontracted labor at East Lake.  *Id.* 54:9-17.  Dawn also communicated directly

with Brian Evans ("Evans"), who Planet subcontracted to perform a substantial portion of the

renovations, concerning aspects of his work at East Lake, including the selection of fixtures and

finishes.  *Id.* 17:24-18:2, 19:21-22; Claimant's Exs. BO, BQ.  Although Dawn was concerned that

she could not afford to pay for the subcontracted labor, she did not direct that Planet cease the use

of subcontractors or order the subcontractors to stop work.  Tr. 48:4-14; *see id.* 54:18-20.  Rather,

Dawn testified that she raised her concerns regarding the cost with Jack, who advised her not to

worry.  *Id.* 48:11-14, 54:18-20.

Dawn was able to move into East Lake in September of 2014.  *Id.* 44:6-7.  At that time,

Dawn reiterated her understanding that she must repay Planet.  Claimant's Ex. BR ("I am an

honorable person and have nearly killed myself cleaning, packing, and moving as I know I need

to repay you.").  Seven months later and facing the threat of foreclosure, Dawn ultimately sold

Bridge Landing via a short sale on April 29, 2015.[3]  Tr. 44:1-5; Stip. of Facts ¶ 2, ECF No. 44.

She continues to reside at East Lake.  Tr. 41:11-12.

Following the completion of renovations, Planet prepared a breakdown invoice itemizing

its costs for the project (the "Breakdown Invoice").  *Id.* 28:11-17; Claimant's Ex. A; Debtor's Ex.

1.  Jack testified that Planet segregates receipts for its jobs into separate folders so that receipts are

not comingled and that none of the items purchased for Dawn's renovations were used on any

other job.  Tr. 65:23-66:12.  Dawn presented no evidence to controvert this testimony or that would

demonstrate that any charge itemized on the Breakdown Invoice did not in fact represent an

amount that Planet expended on her behalf.  The parties agree that Planet provided the Breakdown

Invoice to Dawn.  *See id.* 28:18-20, 50:4-6.  Notwithstanding Planet's demand for payment, Dawn

did not pay any amount and disputed the invoice.  *Id.* 50:4-8, 53:1-2.  As a result, in 2017, Planet

filed a collection proceeding against Dawn in the Circuit Court for the City of Virginia Beach,

Virginia.  *See* Ch. 13 Voluntary Petition at 42, ECF No. 1.  On June 27, 2019, while the lawsuit

remained pending in the state court, Dawn filed the above-captioned bankruptcy case.  *See id.*

### b. The Claim

On July 19, 2019, Planet filed the Original Claim in Dawn's bankruptcy case, asserting an

unsecured claim in the amount of $77,729.23 for "services performed, money loaned."  Debtor's

Ex. 1.  Planet attached the Breakdown Invoice in support of the Original Claim.  *Id.*  Planet

subsequently filed the Amended Claim on August 9, 2019, increasing the claimed amount to

$161,676.80.  Debtor's Ex. 2.  The Amended Claim attaches a spreadsheet that reflects accrued

---

[3]      In addition to the East Lake project, the record suggests that Planet also performed some
renovations at Bridge Landing prior to the short sale.  Tr. 38:23-25, 39:2-3, 53:11-14.  The record
is silent as to the specific nature or extent of work Planet performed at Bridge Landing, but it
suggests that the renovations at Bridge Landing were nominal in comparison to those at East Lake.

interest from December 2014 through June 2019 on the $77,729.23 amount listed in the Original

Claim. *Id.*; *see* Tr. 29:11-14.

The Breakdown Invoice expressly excludes various charges: unspecified costs for a garage

remodel, unspecified storage unit rental fees, and Jack's labor at a cost of $3,300. Debtor's Ex. 1.

The actual sum of the charges included on the Breakdown Invoice is $74,429.23. *See id.* However,

the total amount due listed on the Breakdown Invoice is $77,929.23. *Id.* The Court is unable to

discern the basis for this $3,500 discrepancy with any degree of certainty. Further, the principal

amount of the Amended Claim—$77,729.23—is $3,300 higher than the actual sum of the charges

included on the Breakdown Invoice. *See id.* Here, it appears that this discrepancy likely results

from the incorporation of $3,300 in labor by Jack, which is a charge that was specifically excluded

from the Breakdown Invoice. *See id.* ("Jack[']s labor 132 hours also not included 3300.00.")

Dawn filed an objection to the Original Claim and Amended Claim, contending that the

attachments to the proofs of claim failed to "provide any substantive information on the basis for

[the] debt or specifics supporting the amounts claimed." Obj. ¶ 9, ECF No. 17. Dawn also argued

that the Amended Claim failed to provide any information on how interest was determined or the

legal basis for providing interest. *Id.* And, as discussed above, the Objection observes that the

itemized amounts do not equal the principal amount claimed. *Id.* ¶ 10. On these grounds, the

Objection contests the validity of the Original Claim and Amended Claim and Dawn's liability

thereon. *Id.* ¶ 15.

## II. Conclusions of Law

In bankruptcy, a "claim" is generally defined as a legal or equitable right to payment. 11

U.S.C. § 101(5). To receive payment in a bankruptcy case, a creditor must first file a proof of

claim, which sets forth the creditor's claim in writing. Fed. R. Bankr. P. 3002(a); *see* 11 U.S.C. §

501(a); Fed. R. Bankr P. 3001(a).  If a creditor timely files a proof of claim, it is deemed allowed

unless "a party in interest" objects.  11 U.S.C. § 502(a).  If an objection to claim is filed, the court

must determine the amount and validity of the claim.  *Id.* § 502(b).  This determination is governed

by a burden-shifting process set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy

Procedure.  *See Stancill v. Harford Sands, Inc.* (*In re Harford Sands, Inc.*), 372 F.3d 637, 640 (4th

Cir. 2004); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  The burden of proof

shifts as follows:

> When a claimant files a proof of claim with all of the required supporting
> documentation, it is prima facie evidence of the claim's validity and the amount
> owed by the debtor. *In re Falwell*, 434 B.R. 779, 783 (Bankr. W.D. Va. 2009); *see
> also* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance
> with these rules shall constitute prima facie evidence of the validity and amount of
> the claim."). "The burden then shifts to the debtor to object to the claim," and to
> "introduce evidence to rebut the claim's presumptive validity." *Harford Sands*, 372
> F.3d at 640. Such evidence "must be sufficient to demonstrate the existence of a
> *true dispute* and must have probative force equal to the contents of the claim."
> *Falwell*, 434 B.R. at 784 (emphasis in original). "If the debtor offers such evidence,
> the burden shifts back to the creditor to produce evidence meeting the objections
> and establishing the claim." *Id.*

*Meral, Inc. v. Xinergy, Ltd.*, Civ. Action No. 7:16CV00059, 2016 WL 7235846, at *3 (W.D. Va.

Dec. 13, 2016).  Although the burden of proof shifts, "[t]he burden of persuasion is always on the

claimant."  *Allegheny Int'l*, 954 F.2d at 174 (citations omitted).

### a. Claimant's Initial Burden

A claimant must first file a legally sufficient proof of claim.  *See* Fed. R. Bankr. P. 3001(f);

*Allegheny Int'l*, 954 F.2d at 173.  Failure to do so will deprive a claim of the presumption of prima

facie validity because the claim, on its face, cannot establish a legal liability of the debtor to the

creditor.  *See* Fed. R. Bankr. P. 3001(f); *Allegheny Int'l*, 954 F.2d at 173; *In re Hilton*, No. 12-

61102, 2013 WL 6229100, at *5 (Bankr. W.D. Va. Dec. 2, 2013); *Falwell v. Roundup Funding

LLC* (*In re Falwell*), 434 B.R. 779, 783 (Bankr. W.D. Va. 2009).  Planet thus has the initial burden

of alleging facts sufficient to support a legal liability owed to it by Dawn.  Both the Original Claim and Amended Claim state that the basis for Planet's claim is "Services performed; money loaned." Proof of Claim 3-1; Proof of Claim 3-2.  Planet has alleged in this proceeding that its claim arises from a contract.  *See* Tr. 84:22-24; Claimant's Post-Trial Br. at 5, ECF No. 49; Claimant's Reply Br. at 2, ECF No. 53.  When a claim is based on a writing that is not an open-end or revolving consumer credit agreement, the claim must include a copy of the writing or, "[i]f the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction."  Fed. R. Bankr. P. 3001(c)(1).  But neither the Original Claim nor the Amended Claim attached a service contract, promissory note, or any other writing that would establish a legally enforceable obligation owed by Dawn to Planet.  *See* Proof of Claim 3-1; Proof of Claim 3-2.  Instead, Planet attached the Breakdown Invoice and an interest accrual spreadsheet to the Original Claim and Amended Claim, respectively.  Proof of Claim 3-1; Proof of Claim 3-2.  The invoice and spreadsheet merely provide an itemization of the claimed amounts, but do not by themselves create a legally binding obligation or constitute a basis for a right to payment.  Accordingly, the Court finds that the claim is not entitled to a presumption of prima facie validity.

### b. Objector's Burden

A claim that lacks prima facie validity is not disallowable per se.  *In re Canlas*, No. 08-10688-RGM, 2008 WL 4736350, at *1 (Bankr. E.D. Va. Oct. 21, 2008); *In re Goeller*, Case No. 12-17123-RGM, 2013 WL 3064594, at *2 (Bankr. E.D. Va. June 19, 2013).  If there is no presumption of prima facie validity of a claim, the debtor need only object to the claim pursuant to the applicable rules, citing a good faith basis for the objection, rather than produce "evidence of equally probative value in rebuttal."  *Falwell*, 434 B.R. at 783-84.  A substantive, good faith objection is necessary to seek disallowance of the claim because the failure to provide

documentation required under Federal Rule of Bankruptcy Procedure 3001(c) alone "does not mean that the debtors do not owe the money to the creditors." *Canlas*, 2008 WL 4736350, at *1; *see Goeller*, 2013 WL 3064594, at *3 ("Substantive objections on the merits of a claim, such as an incorrect calculation of the claim, that the claim is not owed or that payments have not been credited, are favored over objections to technical or procedural defects."); *In re Lapsansky*, No. 04-26238REF, 2006 WL 3859243, at *2 (Bankr. E.D. Pa. Oct. 31, 2006) (observing that courts "have denied claim objections that do not actually contest the debtor's liability to the claimant, or the amount of the debt"). To be sure, a debtor's good faith denial of liability under 11 U.S.C. § 502(b)(1) may nevertheless arise from the lack of documentation in that the debtor contests that the creditor possesses any right to payment, which may be evidenced by the failure of documentation. *See In re White*, No. 06-50247-RLJ13, 2008 WL 269897, at *6 (Bankr. N.D. Tex. Jan. 29, 2008); *In re Kendall*, 380 B.R. 37, 46 (Bankr. N.D. Okla. 2007). If a debtor objects on this basis, the burden shifts to the claimant to prove the amount and validity of the claim. *See White*, 2008 WL 269897, at *6; *In re Kendall*, 380 B.R. at 46.

Here, Dawn did not object only because Planet failed to attach to its claim a writing pursuant to Federal Rule of Bankruptcy Procedure 3001(c)(1). The Objection instead contests both Dawn's liability and the validity of the claimed amount, and argues that Planet's claim is unenforceable against Dawn under 11 U.S.C. § 502(b)(1). Obj. ¶¶ 12-13. The Objection denies that the Original Claim and Amended Claim are enforceable against Dawn because they fail to "provide any substantive information on the basis for this debt or specifics supporting the amounts claimed" or "set forth a proper basis supporting its claim." *Id.* ¶¶ 9, 14. In addition, the Objection alleges that the amount claimed is inaccurate based upon the attached invoice and that there is no legal basis for the interest assessed on the attached spreadsheet. *Id.* ¶¶ 9-10.

The Court therefore finds that Dawn objected to the Original Claim and Amended Claim in accordance with the applicable rules and raised good faith bases for the Objection. Accordingly, the Objection shifts the burden of proof back to Planet to establish the validity of its claim by a preponderance of the evidence. *Harford Sands*, 372 F.3d at 640.

### c. Claimant's Ultimate Burden

Planet contends that it has a right to payment under three contract theories of recovery: (1) breach of an express contract; (2) quantum meruit; and (3) unjust enrichment. *See* Claimant's Post-Trial Br. at 5; Claimant's Reply Br. at 2-4. Whether a right to payment exists under these theories "is to be determined by reference to state law." *Butler v. NationsBank, N.A.*, 58 F.3d 1022, 1029 (4th Cir. 1995) (citations omitted) (stating that although federal law governs which claims are cognizable under the Bankruptcy Code, the threshold question of whether a right to payment exists, absent preempting federal law, is determined by rules of state law); *In re Smith*, 419 B.R. 622, 628 (Bankr. E.D. Va. 2008) (citations omitted) ("The validity of a creditor's claim is determined by rules of state law.").

The Objection asserts that Planet's claim is unenforceable against Dawn and her property under any agreement or applicable law pursuant to 11 U.S.C. § 502(b)(1). Obj. ¶¶ 12-13. In *Travelers Casualty & Surety Company of America v. Pacific Gas & Electric Company*, the Supreme Court of the United States recognized that a court must determine a claim pursuant to § 502(b)(1) consistent with

> the settled principle that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000). That principle requires bankruptcy courts to consult state law in determining the validity of most claims. *See ibid.*

> Indeed, we have long recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" *Ibid.* (*quoting Butner v. United States*, 440 U.S. 48, 57, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979) (citation omitted)). Accordingly, when the Bankruptcy Code uses the word "claim"—which the Code itself defines as a "right to payment," 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law. As we stated in *Butner*, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S. Ct. 914; accord, *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S. Ct. 237, 91 L. Ed. 162 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.").

549 U.S. 443, 450-51 (2007). As observed by Chief Judge Opel, "[a] claim against the bankruptcy estate . . . will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy." *Nicholson v. eCAST Settlement Corp.* (*In re Nicholson*), 602 B.R. 295, 303 (Bankr. M.D. Pa. 2019) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n. 66 (3d Cir. 2005) (citation and internal quotation marks omitted)).

To determine which state's law applies, "[a] bankruptcy court applies the choice of law rules of the forum state." *Stanworth v. Bank of. Am., N.A.* (*In re Stanworth*), 543 B.R. 760, 772 (Bankr. E.D. Va. 2016). This Court sits in Virginia, and thus Virginia's choice of law rules determine the applicable state law in this case. Under Virginia law, to determine issues of contract law in the absence of a forum selection clause

> the law of the place where the contract was made governs issues concerning the interpretation, validity, and enforceability of the contract. A contract is made where the final act completing the contract occurs. However, the law of the place of performance governs issues concerning performance of the contractual duties. In other words if the issue is one of breach of contract, then the law where performance occurred applies.

*Off. Comm. of Unsecured Creditors v. Fairchild Dornier GMBH* (*In re Dornier Aviation (N. Am.)
Inc.*), No. 02-8199-SSM, 2005 WL 4781236, at *12 (Bankr. E.D. Va. Feb. 8, 2005), *aff'd sub nom*,
*In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225 (4th Cir. 2006) (internal citations omitted); *C.
I. T. Corp. v. Guy*, 195 S.E. 659, 661 (Va. 1938) ("The nature, validity and interpretation of
contracts are governed by the law of the place where made, unless the contrary appears to be the
express intention of the parties.").

Here, there is no forum selection clause at issue.  The record reveals, however, that all acts
related to the alleged express or implied contract between Planet and Dawn occurred in Virginia.
Virginia law therefore governs the determination of the claim.  Accordingly, to determine whether
Planet possesses a legal or equitable right to payment against Dawn, the Court will consider the
aforementioned contract theories under Virginia law.

*i. Breach of Contract*

The essential elements of a cause of action for breach of contract are: (1) a legal obligation
of the defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a
consequential injury or damage to the plaintiff.  *Caudill v. Wise Rambler, Inc.*, 168 S.E.2d 257,
259 (Va. 1969).  The first element requires the plaintiff to establish the existence of a valid contract.
*Gulsen v. PNC Bank, Nat'l Ass'n*, Case No. 1:12-cv-202, 2012 WL 13018998, at *6 (E.D. Va. July
9, 2012).  A contract requires an offer, acceptance, and valuable consideration.  *Montagna v.
Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980).  Thus, because a contract cannot form in the
absence of an offer, the Court must determine whether a valid offer was made as a threshold issue.

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify
another person in understanding that his assent to that bargain is invited and will conclude it."
Restatement (Second) of Contracts § 24 (Am. Law Inst. 1981).  In other words, "an offer identifies

the bargained for exchange and creates a power of acceptance in the offeree." *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 930-31 (Va. 1991) (citing Restatement (Second) of Contracts § 24 (Am. Law Inst. 1981)).  An offer, however, "cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain."  Restatement (Second) of Contracts § 33 (Am. Law Inst. 1981); *McNeil v. Haley S., Inc.*, Civ. Action No. 3:10cv192, 2010 WL 3670547, at *4 (E.D. Va. Sept. 13, 2010) ("The agreement must identify the subject matter and essential terms with reasonable certainty.") (citing *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 819 (Va. 1981); *Progressive Constr. Co. v. Thumm*, 161 S.E.2d 687, 691 (Va. 1968)).  An offer also must be "clear, definite, and explicit" so as to "enable a court to give the contract an exact meaning." *Dodge v. Trustees of Randolph-Macon Woman's Coll.*, 661 S.E.2d 801, 803 (Va. 2008); *Jud. Inquiry & Rev. Comm'n of Va. v. Elliott*, 630 S.E.2d 485, 496 (Va. 2006) ("The most basic principle of contract law is that when one party makes an offer that is clear, definite, and explicit, and leaves nothing open for negotiation, acceptance of that offer by the other party will complete the contract.").  For example, if a contract is for services, it must be "certain and definite as to the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid." *Mullins v. Mingo Lime & Lumber Co.*, 10 S.E.2d 492, 494 (Va. 1940); *see also Fid. Nat'l Title Ins. Co. v. Radford*, Civ. Action No. 7:15-cv-00018, 2016 WL 3102233, at *4 (W.D. Va. June 2, 2016) (holding that even if the plaintiff had performed certain services, no express contract existed where writings failed to clearly define the scope, duration, and consideration for such services).

Planet first asserts that an express contract was formed by the text message exchange between Dawn and Jack.  Claimant's Reply Br. at 2 ("[T]here was a request to perform services . . . an acceptance of that request . . . and consideration. . . . Thus, all of the requisite elements for a

contract are present.").  Accordingly, to determine whether a contract was indeed formed by the text messages, the Court must determine first whether the text messages contain a valid offer.

Upon review of the text message exchange, the Court finds that the text messages do not contain a valid offer.  Indeed, they contain anything but clear, definite, and explicit terms of a proposed agreement.  Critically, the text messages fail to clearly define the scope and duration of the services; they only vaguely reference an unspecified plan to "fix[] up the house" "quickly" and make it "liveable" and "mold free."  Claimant's Ex. BK.  The text messages also do not identify the cost.  Thus, viewing the text messages objectively, their failure to clearly specify any essential terms would prohibit a reasonable person from viewing them as an offer.  *Adams v. Doughtie*, 63 Va. Cir. 505, 521 (2003) ("[T]he question is whether a reasonable person would have objectively believed an offer was made, not whether the offeror subjectively actually intended to make an offer.").  Likewise, the text messages' vagueness would make it impossible for a court to determine the respective obligations of the parties under the alleged agreement.  For these reasons, the Court finds that the text messages are simply too ambiguous to satisfy the requirements for a valid offer and thus they cannot form the basis of an express contract.

In addition to the text messages, Planet contends that the email messages between Dawn and Kim constituted an express contract.  Claimant's Reply Br. at 2.  The email exchange at issue between Dawn and Kim occurred in early November 2013.  These emails imply that, sometime prior to the email exchange, Dawn and Jack engaged in further discussions about the renovations.  While the email messages are indeed on the subject of the renovation project, the email messages are insufficient to constitute an offer.[4]

---

[4]     The Court is able to make this finding without reaching the issue of whether Kim has the authority to make or accept an offer.

15

First, Kim's email messages to Dawn are not clear, definite, and explicit so as to permit the Court to ascertain that an offer was made. Kim's email messages merely indicate that any renovations performed must be performed as a job, at a limited cost, and with repayment on completion. Key components of an offer, such as cost or scope, that would define the parties' respective obligations are wholly absent from Kim's emails to Dawn. Kim also attempted to dissuade Dawn from pursuing the renovation project by warning her that the scope of work may end up being more significant and costly than Dawn anticipated and urged her to reconsider going through with the sale, which suggests anything but the willingness to enter into a bargain that must be present in an offer. For these reasons, the Court finds that Kim's email messages do not constitute the basis for an express contract.

Second, Dawn's email messages also fail to constitute a valid offer. Dawn's email messages discuss her desire for a quick turnaround, but make no mention of any specific duration for the project. Dawn also describes vaguely her objective to make the house "liveable" and assures Kim that she will repay Planet for the job as soon as possible, but her statements about payment are not qualified by any specific cost. Thus, Dawn's emails do not provide any definite statements as to "the nature and extent of service to be performed" or "the compensation to be paid." *Mullins*, 10 S.E.2d at 494. Because Dawn's emails to Kim fail to propose any clear duration, scope, or cost, the essential terms of an offer were not present. Accordingly, the Court finds that Dawn's emails cannot form the basis for an express contract.

For the foregoing reasons, the Court finds that neither the text messages nor the emails constituted an offer sufficient to create "a power of acceptance in the offeree." *Chang*, 410 S.E.2d at 930-31. In the absence of a valid offer, the Court finds that no express contract exists on the basis of either the text messages or the emails. Therefore, the Court finds that Planet has failed to

16

prove by a preponderance of the evidence that the Claim may be allowed on the basis of a breach of an express contract.

### ii. Implied Contract and Quasi-Contract

Having determined that the claim is not based upon an express contract between Dawn and Planet, the Court must now consider whether Planet instead holds an equitable right to payment in this case. In the absence of an express contract, a court may consider whether a contract may be implied from the facts or the law. *Ellis & Myers Lumber Co. v. Hubbard*, 96 S.E. 754, 760 (Va. 1918) (citing *Grice v. Todd*, 91 S.E. 609 (Va. 1917)). These causes of action include claims for *quantum meruit* (contract implied in fact) and claims for unjust enrichment (quasi-contract). *RehabCare Grp. E., Inc. v. BROC L.L.C.*, Case No. 4:17-cv-00043, 2018 WL 1935869, at *4 (W.D. Va. Apr. 24, 2018). Courts have often used the terms "*quantum meruit*" and "unjust enrichment" synonymously, *Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 477 (E.D. Va. 2014), often leading to the conclusion that these terms refer to the same cause of action and share the same elements. However, as the Fourth Circuit observed in *Fessler v. International Business Machines Corporation*, 959 F.3d 146 (4th Cir. 2020), the Virginia Supreme Court recently clarified that unjust enrichment and *quantum meruit* are in fact two distinct causes of action. *Id.* at 156-57. Recognizing that they can be "easily conflated," the Virginia Supreme Court described their separate analytical frameworks as follows:

> Turning first to *quantum meruit,* a Latin phrase meaning "as much as he has deserved," *Black's Law Dictionary* 1361 (9th ed. 2009), we have addressed the remedy as follows: "[w]here service is performed by one, at the instance and request of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the service shall be paid a reasonable compensation therefor." *Mongold v. Woods*, 278 Va. 196, 203, 677 S.E.2d 288 (2009) (quoting *Rea's Adm'x v. Trotter*, 67 Va. (26 Gratt.) 585, 592 (1875)). The remedy available to the plaintiff in *quantum meruit* is an award of damages amounting to the reasonable value of the work performed, less the compensation actually received for that work. *Id.*

The cause of action for unjust enrichment, on the other hand, applies as follows: (1) "[plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116, 661 S.E.2d 834 (2008) (citing *Nedrich v. Jones*, 245 Va. 465, 476, 429 S.E.2d 201 (1993)).

The measure of recovery for *quantum meruit* for a contract implied in fact is the reasonable value of the services provided. *Mongold*, 278 Va. at 203, 677 S.E.2d 288. The measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant. *Schmidt*, 276 Va. at 116, 661 S.E.2d 834. The measure of damages is thus not necessarily the same.

*T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 340-41 (Va. 2020) (footnote omitted).

These separate frameworks arise because the two causes of action are fundamentally different at their core. *Quantum meruit*—or a contract implied in fact—is an action in contract; however, it is not based on an express oral or written contract, but rather upon one that equity implies from the facts and circumstances. Candace Saari Kovacic-Fleischer, *Quantum Meruit and the Restatement (Third) of Restitution and Unjust Enrichment*, 27 Rev. Litig. 127, 129-30 (2007) ("Its elements are typically described as a request by the defendant for plaintiff's services (an offer), which are performed (the acceptance) under circumstances in which the parties expect the plaintiff to be compensated (consideration). It is not an express contract because a term has not been discussed. Often it is the price term."); *see also Baltimore & O.R. Co. v. United States*, 261 U.S. 592, 597 (1923) ("[A]n agreement 'implied in fact,' founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."). Unjust enrichment, on the other hand, is "not a contract, but an action in restitution in which the defendant received a gain at plaintiff's expense under circumstances that make it unjust for the defendant to keep the gain." Kovacic-Fleischer, *supra*, at 130. A court resorts to unjust enrichment only "in the absence of an

express contract or contract implied-in-fact, and only when it would be unfair for the recipient to keep a benefit without paying for it." *In re MBA, Inc.*, 51 B.R. 966, 974 (Bankr. E.D. Va. 1985) (footnote omitted) (citation omitted). Accordingly, the Court must perform separate analyses to determine if either theory may be the basis for Planet's claim, beginning with *quantum meruit*.

### 1. Quantum Meruit (Contract Implied in Fact)

The Court will first determine whether *quantum meruit* provides an equitable basis for Planet's claim. "*[Q]uantum meruit* is available when (1) the parties contract for work to be done, but the parties did not agree on a price, (2) the compensation mentioned is too indefinite, (3) there is a misunderstanding as to the price to be paid, or, (4) in some instances, the contract is void and of no effect." *T. Musgrove*, 840 S.E.2d at 341 (citing *Marine Dev. Corp. v. Rodak*, 300 S.E.2d 763, 765 (Va. 1983)). In all instances, recovery in *quantum meruit* is "contingent on performance at the instance and request of another." *Fessler*, 959 F.3d at 158 (internal quotation marks omitted).

The threshold issue here—that Planet's performance occurred at Dawn's request—is easily resolved. As discussed above, it is plain from the record that Dawn sought the renovations performed at her properties. Although Dawn claims that it was Jack who approached her with a desire to renovate East Lake, the record reflects that it was Dawn who urged Jack to consider renovating East Lake because she believed that there would be several personal and financial benefits to making it her residence. And, although the scope of the project grew from what was originally anticipated, Dawn has never contended that the expansion of the project was the result of a unilateral decision by Planet. Rather, the more extensive renovations were necessary to meet Dawn's request to make East Lake a suitable residence given the home's condition. Finally, while Dawn has contended that she did not agree to Planet's use of subcontractors to perform the

renovations, the means by which Planet executed its performance is not germane to the issue of whether Dawn requested the renovations. Accordingly, as stated above, the Court finds that the evidence demonstrates that the renovations were performed at Dawn's instance and request.

In addition, while the parties had a tacit understanding that Planet would handle the renovations, there was no clear agreement as to the price to be paid for the work. The record reflects only assurances from Dawn that she would make full repayment and Kim's insistence that Planet must be reimbursed for the project as a job. Dawn contends it was her understanding that the job would be capped at a cost of $20,000 for materials only, but the record does not support that any such agreement existed. Rather, Jack's testimony that this figure was merely an estimate is more consistent with the nature of a discussion regarding price which occurred prior to commencement of the work and before the true scope of the job was fully understood. An estimate is too indefinite to set the compensation due. Accordingly, while repayment was discussed by all involved, there was a "lack of a meeting of the minds with regard to the exact payment [Planet] would receive for [its] work." *Id.* Accordingly, the Court concludes that Planet has a right to payment under a *quantum meruit* theory.

## 2. Unjust Enrichment

Even if a contract implied in fact did not exist in this matter, the Court would nevertheless be able to imply a contract on the basis of unjust enrichment. To recover under an unjust enrichment theory, Planet must prove: "(1) [plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value." *T. Musgrove*, 840 S.E.2d at 341 (quoting *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008)).

The first and third elements are not in dispute.  There is no question that Planet conferred a benefit on Dawn.  The evidence demonstrates that Planet performed and managed the renovations on Dawn's properties at its expense.  These renovations were extensive and included painting, countertop replacement, hardwood floor refinishing, interior and exterior demolition, framing, door installation, elevated deck construction, siding installation, sheetrock installation, plastering, drywall repair, baseboard and molding installation, scraping of textured ceilings, bathroom remodeling, and carpet replacement.  Dawn has not contested that these improvements took place or presented any evidence to dispute the Breakdown Invoice.  Instead, she contests Planet's right to payment.  Furthermore, Dawn has admitted that she has not made any payment to Planet.

Turning to the second element, the Court will separate it into its compound parts:  whether Dawn knew of the benefit conferred upon her by Planet and whether she should have reasonably expected to repay Planet.  First, as a practical matter, Dawn owned the properties renovated by Planet, residing in one and intending to reside in the other, and it would simply defy reason to conclude that she lacked knowledge of the renovation work performed.  The evidence confirms that Dawn knew precisely the benefit she received as a result of renovations performed at Planet's cost.  Dawn periodically checked on the progress of the work at East Lake and communicated directly with the subcontractor who performed a substantial amount of the renovations.  Dawn knew that she had not paid for the work performed.  Thus, it is clear to the Court that Dawn understood the benefit conferred upon her by Planet.  Accordingly, whether Planet has a claim for unjust enrichment depends on whether Dawn reasonably should have expected to pay for the labor and materials that Planet furnished for the renovation project.

Throughout this proceeding, Dawn has vigorously contested her obligation to repay Planet.  However, the record is replete with unequivocal statements by Dawn made prior to, during, and

immediately after the renovations, which evince her intention to repay Planet.  Indeed, Dawn assured both Jack and Kim that she would repay Planet down to the last penny.  Dawn also specifically expressed her appreciation that the renovations would be done without any upfront payment, which further indicates her understanding that the benefit to her of engaging Planet was not that the job would be gratuitous, but that she would not be required to pay anything in advance. The Court finds that Dawn's statements, which were made during the relevant time, are more credible evidence of her expectations regarding repayment than her in-court testimony to the contrary offered several years later.  Thus, based on the evidence, the Court concludes that Dawn should have reasonably expected to repay and, in fact, did expect to repay Planet.  Accordingly, even if there was not a contract implied in fact in this matter, unjust enrichment would also support Planet's right to payment in this case.

### iii. Measure of Recovery

"The measure of recovery for services furnished or goods received depends on whether the claim is for unjust enrichment or *quantum meruit*."  66 Am. Jur. 2d Restitution and Implied Contracts § 35 (2020).  As a contract cause of action, the measure of recovery for *quantum meruit* is "the reasonable value of the work performed, less the compensation actually received for that work." *T. Musgrove*, 840 S.E.2d at 341 (citing *Mongold v. Woods*, 677 S.E. 2d 288, 292 (2009)). On the other hand, for unjust enrichment, which sounds in restitution, the remedy is disgorgement of "the benefit realized and retained by the defendant." *Id.* (quoting *Schmidt*, 661 S.E.2d at 838).

While each theory provides a different method for measuring recovery, the amount recovered may nevertheless be the same under both theories.  This is because, when the services provided were requested, the measure of recovery for unjust enrichment may be quantified by the reasonable value of such services on the theory that "the defendant benefits by receiving what he

or she asked for."  Kovacic-Fleischer, *supra,* at 130 ("The implied in fact contractual remedy of reasonable value may be a quasi-contractual remedy, but only if the defendant validly requested the plaintiff's services.").  The reasonable value of the services provided is also the measure of recovery under *quantum meruit.*  If the defendant did not request the services provided, unjust enrichment may instead be measured based upon the "value the defendant received from the plaintiff's work, unrelated to the market value of the work or the plaintiff's cost in performing the work."  *Id.*  Thus, in sum, "while contracts implied in fact or implied in law are distinct from each other, the remedies for a contract implied in law may include the remedy for a contract implied in fact, but the contract implied in fact remedy cannot include unjust enrichment."  *Id.* at 131.  The only evidence Planet presented on the issue of its recovery was evidence of the cost of the labor and material it furnished to Dawn in connection with the renovations on her properties.  Having already found that Dawn requested the renovations, the Court may utilize a single analytical framework—the reasonable value of Planet's services—to measure Planet's recovery in this case.

The Court must first address the amount of Planet's claim.  The amount claimed before interest is $77,729.33.  The principal amount claimed is based upon the Breakdown Invoice attached to the Original Claim.  The Breakdown Invoice, however, lists an amount due of $77,929.23, while the actual total of the included charges listed on the Breakdown Invoice is only $74,429.33.  Thus, as the Court previously observed, the principal amount of the claim, the amount due as per the Breakdown Invoice, and the actual total of charges included on the Breakdown Invoice are inconsistent.  While the Court is unable to discern the basis for the amount due stated on the Breakdown Invoice itself, the $77,729.23 principal amount claimed by Planet exceeds the included charges on the Breakdown Invoice by $3,300, which difference corresponds exactly to

the cost of Jack's labor—a cost which the Breakdown Invoice expressly excludes.[5]  There is simply no basis to permit Planet to assert a right to payment in an amount inconsistent with the Breakdown Invoice, which establishes that Planet sought repayment from Dawn of costs totaling only $74,429.23.  The Court therefore concludes that Planet's recovery cannot exceed $74,429.23, but it must now address Dawn's arguments which seek to limit the extent of Planet's recovery.

Dawn speculates in her post-trial pleadings that the receipts underlying the charges on the Breakdown Invoice may relate to different jobs performed by Planet.  Debtor's Post-Trial Br. ¶ 73.  However, Dawn failed to adduce any evidence at trial that would cast doubt on the validity of any of the amounts invoiced.  The unrebutted testimony at trial was that the charges on the invoice correspond to receipts from the renovations on Dawn's properties that Planet collected and segregated in a job-specific folder.  The Court cannot disallow or reduce the claimed amount based on mere speculation.  *See In re Beeton*, No. 95-1734, 1996 WL 350526, at *4 (4th Cir. 1996) (holding that evidence prevails over bare allegations); *see also Bond Distrib. Co. v. Carling Brewing Co.*, 32 F.R.D. 409, 414 (D. Md. 1963), *aff'd*, 325 F.2d 158 (4th Cir. 1963); *Doughton v. Ray*, No. 1:02-CV-00864, 2002 WL 31812918, at *2 (M.D.N.C. Dec. 13, 2002).  Accordingly, because there is no evidence in the record to support Dawn's assertion that certain invoiced charges were associated with other jobs or that would undermine the credibility of the testimony offered by Planet, the Court must reject this argument.

Dawn further asserts that, if she is required to repay Planet, she should not be required to reimburse Planet for the expenses it incurred in connection with the work subcontracted to Evans, who performed the vast majority of the subcontracted labor at East Lake, because she did not agree

---

[5]      The exclusion of this amount is also consistent with Dawn's claim that Jack had offered his own labor gratuitously.

to Planet's utilization of subcontractors.  Debtor's Post-Trial Br. ¶ 51.  Dawn contends that she

neither contemplated that Planet would act as a general contractor and hire subcontractors to

perform renovations, nor entered into any express or implied agreement that would permit Planet

to use subcontractors.  *Id.* ¶¶ 49-50.  Essentially, she argues that she should be able to retain the

value of the renovations that Evans performed on her property—renovations that she requested

and that were paid for by Planet—without reimbursing Planet for this expense because Planet did

not perform the work itself.  This argument must fail.  Prior to work commencing, when the

anticipated scope of the job was limited to cosmetic repairs, Dawn likely did have a basis to *assume*

that Planet would not subcontract labor.  But the expanded scope of renovations later necessitated

Planet's use of subcontractors.  Indeed, Dawn observed subcontractors working at East Lake and

expressed concerns about the potential cost, but she ultimately acquiesced to their use and even

communicated directly with Evans about aspects of his work.  Dawn was clearly aware that

extensive renovations were required at East Lake, that Evans and other subcontractors were

conferring a benefit upon her by performing the skilled labor necessary to complete the

renovations, and that she had not paid anything for their work.  Further, prior to the commencement

of renovations, Dawn expressed her understanding that Planet must be reimbursed for all amounts

it expended on her behalf.  Thus, it would simply belie common sense to conclude that Dawn did

not expect to repay Planet for the subcontracted labor it used to perform necessary renovations at

East Lake—renovations that she requested and accepted—and the benefits of which she still

continues to enjoy.  Accordingly, the Court concludes that there is no basis to exclude from

Planet's damages the subcontracted work performed by Evans or anyone else.

As discussed above, Dawn also argues that any recovery should be limited to $20,000.

First, Dawn contends that Jack presented this number to her as a cost ceiling for the renovations,

whereas Jack claims it was merely an initial estimate.  To bolster her interpretation, Dawn points

to a statement in an email from Kim, indicating that Planet had no more than $15,000 to devote to

the project.  *Id.* ¶¶ 62, 64.  However, taken in context, Kim's statement undermines Dawn's

position because Kim went on to caution Dawn that "the house is going to cost a lot more than

[$15,000] to refurb[ish]."  Claimant's Ex. BL.  Dawn's position is also contrary to her own

statements at the time which do not acknowledge an express or implied limitation on the cost.  *See,*

*e.g.*, *id.* (stating she would repay "every cent"); Claimant's Ex. BK (stating she would repay "every

last penny"); Claimant's Ex. BR (". . .  I know I need to repay you.").  As previously discussed,

the Court finds credible and consistent with the circumstances of a renovation Jack's testimony

that the $20,000 figure was merely an estimate, which was provided before work commenced and

when the anticipated scope of renovations was limited.  An estimate by its very nature is only an

approximation, not a guarantee, and thus cannot bind either party or limit Planet's recovery.

Second, Dawn argues that she should not be liable for more than $20,000 because she "could only

repay the supplies and materials through the sale of Bridge Landing," which potential proceeds

she asserts were lost due to Planet's delay in completing the East Lake renovations.  Debtor's Post

Trial Br. ¶¶ 57-58, 61.  Even assuming *arguendo* that Dawn did indeed possess equity in Bridge

Landing which was depleted by the time of the short sale, the unavailability of an anticipated

source of repayment simply has no bearing whatsoever on the extent of a repayment obligation.

Accordingly, the Court declines to impose a $20,000 limitation on the reasonable value of the labor

and materials that Planet furnished to Dawn.

Accordingly, having rejected each of Dawn's attempts to limit Planet's right to payment in

this case, the Court concludes that Planet is entitled to a principal award of damages from Dawn

in the amount of $74,429.23.

1. Prejudgment Interest

The final component of the measure of recovery under unjust enrichment and *quantum meruit* is whether Planet is entitled to prejudgment interest. Planet amended its proof of claim to include prejudgment interest in accordance with Virginia law. Proof of Claim 3-2. Planet argues that awarding interest is "appropriate in this case to compensate [it] for the loss of the use of its funds for over five years." Claimant's Post-Trial Br. at 6.

A court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code Ann. § 8.01-382. Prejudgment interest is generally "not allowed on unliquidated damages in dispute between the parties." *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 160 (Va. 1998) (citations omitted). However, a decision to award prejudgment interest is ultimately within the sound discretion of the trial court. *Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co.*, 973 F.2d 359, 369 (4th Cir. 1992); *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994). "A court's discretion is guided by balancing the equities of each case—in particular, the desire to make the prevailing party whole, including compensation for its lost ability to use the money to which it was rightfully entitled, [against] the losing party's right to litigate a bona fide legal dispute." *Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC.*, Civ. Action No. 1:16-cv-303, 2017 WL 3219281, at *20 (E.D. Va. July 28, 2017) (citing *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 823 F. Supp. 2d 364, 366 (E.D. Va. 2011)).

Here, Planet has been deprived of the funds it expended for the renovations for several years. At the same time, there was a substantial and bona fide dispute regarding Dawn's liability to Planet for the renovations. Litigation of this issue began in the state court in 2017. The uncertainty regarding Dawn's liability arises directly from the fact that the parties never came to

an express written agreement with respect to the cost or other essential terms of the project that would define the parties' obligations. The right to payment is instead grounded in equity, which requires a judicial determination of the reasonable value of the services provided. Thus, not only were the damages unliquidated at the time of the dispute, but Dawn's liability was essentially nonexistent until judicially determined herein. Upon weighing the equities and considering the circumstances of this case, the Court concludes, in its discretion, that making Planet whole requires no more than the awarded damages and that awarding prejudgment interest is not appropriate.

### III. Conclusion

For the reasons stated in this Memorandum Opinion, the Court concludes that Planet has proven by a preponderance of the evidence that it is entitled to an award of damages against Dawn in the amount of $74,429.23. The Amended Claim is therefore allowed in the unsecured amount of $74,429.23, and all amounts claimed in excess of $74,429.23, including prejudgment interest, are disallowed. Accordingly, the Objection is overruled in part and sustained in part. The Court will enter a separate Order consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk shall deliver copies of this Memorandum Opinion to Barry W. Spear, counsel for Dawn Elaine Reed; Todd D. Rothlisberger, counsel for Planet Plumbing, LLC; and Michael P. Cotter, Chapter 13 Trustee.

Entered this 9th day of December 2020, at Norfolk in the Eastern District of Virginia.

FRANK J. SANTORO
Chief United States Bankruptcy Judge

Entered On Docket: Dec 9 2020